Case number 103933, People of the State of Illinois v. Deon Banks. Counsel may approach the bench and proceed. May it please the court and counsel, I'm Alan Andrews from the Office of the State Appellate Defender and I represent Deon Banks in this capital case. Mr. Banks' death sentence resulted from a capital sentencing hearing that was tainted by irrelevant evidence of how the Department of Corrections runs its prison system and by unreliable, unconfronted hearsay testimony about a prior murder. The first issue I'd like to discuss is Issue 6. That deals with the State introducing irrelevant evidence of privileges that the Department of Corrections affords the general population of inmates in the State of Illinois. The State called Glenn Davis the records keeper for the Department of Corrections to testify at the second stage of the sentencing hearing. Mr. Davis testified that a defendant who is sentenced to natural life would be placed in a maximum security prison that would have fewer programs, he said, vocational training, adult education, a GED program. It would have a library with books and magazines. The inmates can take those books and magazines to their cells. It has a commissary, which he described as a store within the institution. Inmates can buy food and clothing. They can buy a radio. They can buy a television. They can take their radio. They can take their television to their cells. He testified they get to go outside to the yard two hours a day. They can play basketball, softball. They can jog and they can just socialize with the other inmates. Then Mr. Davis testified it's possible to transfer to more lenient institutions where they might have day rooms with televisions where you can watch TV all day. Some show movies. Some bring in outside entertainment groups for the benefits of the inmates. Some have culinary arts programs, woodshops, auto repair programs, auto detailing programs. Then in contrast, a state called Robert Griffin, an assistant warden at Pontiac where the death row is located, and he testified that death row inmates only get to go out to the yard five hours a week. Now, I list all that information because it simply is not relevant at the second stage of a capital sentencing hearing. Evidence is relevant if it has some bearing on the circumstances, the offense, the character of the defendant or the rehabilitative potential of a particular defendant. This obviously had nothing to do with the circumstances of the offense or Mr. Banks' character. The South Carolina Supreme Court held that this type of evidence is not related to a particular defendant's rehabilitative potential because it is not tailored to him as an individual. It is simply a description of what any given inmate in the Department of Corrections might have, what privileges that person, that hypothetical person might have. Mr. Andrews, how do you address what I believe is the state's position that the relevance goes to how this particular inmate would interact with the other inmates? Again, it doesn't, it's not tailored to anything of Mr. Banks. It's just a general description of how any inmates would, you know, behave or interact or what privileges they have. It's not tailored to how Mr. Banks would interact with the other inmates. There is no mention of that. And secondly, I would point out that the state has adopted a different position from what it did at the trial. At the trial, it was not presented in any fashion to show how Mr. Banks would interact with inmates in the Department of Corrections. It was presented to show that Mr. Banks should be sentenced to death because a prison sentence is too easy. And let me quote at length from the very end of the state's rebuttal argument at the second stage of the capital hearing. They want the minimum. He doesn't deserve the minimum. He deserves the penalty of death. Deon Banks, he gets what he wants. Don't give him what he wants. Life in general population is like sending him to his room. When you think about sending him to his room, remember, he tried that before, this is what you get. Send him to his room, so what does he do? Gets up, then he goes and has some recreation in the yard, goes to commissary, hangs out in a dietary, swaps some stories with some buddies. Maybe later a little bit to eat, maybe over to the library. That's his life in prison. Maybe he could talk to some people about some of the crimes he's committed, then sit down for a new DVD, watch a movie. Don't forget in prison he gets visits. That's the last thing he said. This isn't anything about how he interacts. That's not how it was presented at all. It was presented simply to show that because of the way the Department of Corrections runs its prisons, prisons is a nice place. And Deon Banks doesn't deserve to be sent to any place where there are all these privileges. He deserves to be killed. Is there any part of that argument, I know that the state called 20-some witnesses to talk about Mr. Banks' abusive behavior. Some of those were DOC officials, right? Yes. When they talk about that, or do they talk about that and close an argument and link it to being in the general population? I don't recall that they link it to this gentleman's testimony. They did certainly talk at great length about what a jerk my client is in prison and the low-level misbehavior they brought out, tons of it, how obnoxious he is. But this is entirely separate, and that argument shows that. It's just pure and simple. It was an argument that, you know, he's going to have fun in prison, and therefore he should be sentenced to death. Isn't the state's position that in view of the evidence in this case, that that information was harmless? Yes, the state argued, as they do in every single issue, that the evidence was harmless. But I don't believe that's the case. If you think about the way people react to prison, you know, this country club prison is part of the lexicon of the United States anymore. People don't like the idea of inmates having privileges. They don't like the idea particularly of paying for inmates having privileges. And I think this is a very powerful argument that shows, you know, it appeals to jurors. You know, if you talk to people about why they support death row or executions, one of the things they'll tell you is, why should I pay to keep this guy alive for the rest of his life after the horrible things that he's done? And this argument, this evidence, that plays on that irrational, it's not necessarily irrational, but it shouldn't have any place in the sentencing hearing where the evidence should be, the decision should be based on the crime and the circumstances and the defendant's rehabilitative potential, not whether or not we want to pay for keeping him alive. In addition to being irrelevant, this type of evidence interjects an arbitrary factor into the sentencing hearing, and as this Court well knows, a capital sentencing hearing is supposed to be devoid of arbitrariness. You know, if the state can prove that the Department of Corrections runs this apocryphal country club kind of prison, then we're going to see more death sentences, because jurors aren't going to want to send people to this fancy, nice prison system. On the other hand, if we were to, if the Department of Corrections were to go about course and run an incredibly harsh, very punitive, very vindictive prison system with no privileges, everybody in their cell 24 hours a day, I guess we could expect to see far fewer executions, far fewer death penalties, and that's arbitrary, because it has nothing to do with the crime, and it has nothing to do with the defendant. It has everything to do with the administrative, the policy decisions of the Department of Corrections, and that's the main reason that the South Carolina Supreme Court held that this evidence was inadmissible, because it's arbitrary. And this court long ago held that the defense cannot present evidence of how excruciating an execution can be, because it has nothing to do with the defendant, and it has nothing to do with the crime. And this is exactly the same type of thing. It's a policy decision how you execute somebody. It's a policy decision how you run your prison system. And one of the other major underpinnings of the South Carolina Supreme Court's decision was this notion that they had also forbidden presenting evidence that executions were excruciating. So the logic here is that this evidence simply is irrelevant, and it's arbitrary, and it shouldn't be admitted. Furthermore, when you, if you permit this type of evidence, this court is really going to open up a can of worms that's going to alter the way that capital sentencing hearings are conducted. If the state can show that prisons are nice places, we're going to show that prisons are bad places. We ought to be able to bring in the incidents of AIDS in the prisons, incidents of tuberculosis, sexual assaults, beatings, we should be able to bring all of that in. I mean, are we going to have capital sentencing hearings that come down to the quality of the food that they get? This is the type of thing, it's going to be a trial within a trial, and it's all going to be a referendum on how the Department of Corrections runs its program. And that's not what the second stage proceedings ought to be. Would you be making the same argument, Mr. Andrews, if they did link up the, you know, what happens in the general population versus the personality of the specific defendant in this case? You know, if they could show that the defendant was a psychopathic predator, I would have no argument. But that's not what they did here. Even the South Carolina Supreme Court said if you can tailor this evidence to the particular defendant, then it would be, you know, admissible, there's no problem there. So my argument, you've zeroed in on, you know, a linchpin of the argument, and it relies on that closing argument where it is just an argument that prison is nice and he doesn't deserve to be sent there. And a reasonable inference would not be enough then? I mean, the fact that DOC officials did testify as to his abusive behavior and what happens in the general population isn't enough, you have to link those two together? Well, and particularly in this case where there's no evidence at all that he's going to any of these medium security institutions that he's talked to. I mean, he's got a natural life sentence, he's going to Menard. They never showed that he was going to be able to avail himself of any of these programs. And they never even made an attempt to have these witnesses testify that Mr. Banks would be at a medium security prison availing himself of the woodworking shop or the auto classes. And they absolutely didn't do anything like that. You know, in the Tribune last week there was an article about a 21-year-old who had a seven-year sentence for arson and they sent him to Menard and put him in the cell with a 35-year-old psychopath. And the guy was begging to be let out of the cell and the guards ignored him and the psychopath strangled him and he was quoted to death. And he was quoted in the Tribune as saying he was delivered like the blood of a lamb to me, whatever that means. It means something to a psychopath, I suppose. And one of the guards was quoted as saying, it's my job to make sure they don't escape. It's not my job to make sure they're safe. Are we going to be able to call that guard at every capital sentencing hearing to show that prison is a bad thing? I just think that this type of evidence, it's really a bad idea and it's just not relevant. And that would conclude my presentation on that issue unless there are further questions. The next and final issue I'd like to talk about is Issue 7. It's a Crawford issue, you know, and I'm going to argue that this Court needs to apply the right to confront witnesses, the Sixth Amendment right to confront witnesses to the second stage of the sentencing hearing, the aggravation mitigation stage where it currently doesn't apply. Now, the evidence that's relevant to this is at the second stage of the sentencing hearing in this case, the State called an attorney, Barry Gross, who testified that he was an Assistant State's Attorney in 1985. He worked on the murder of Alfred Evans. During the investigation, he had a gentleman named Mark Carrington testify before the grand jury. Carrington's now dead. At Mr. Banks's sentencing hearing, Gross read Carrington's grand jury testimony from 1985. Now, Carrington had told the grand jury that Carrington was a member of the Gangster Stones in Chicago, that Mr. Banks was a general in the Gangster Stones and that his name was General Dog. Carrington told the grand jury that he met Mr. Banks March 15, 1985, and Mr. Banks told him to come along with him to get some narcotics. They walked a couple blocks to a building. Carrington testified that Mr. Banks told him to wait outside. Mr. Banks went inside and Carrington saw him talk to two people in the hallway of the building. He saw Mr. Banks shoot one of the men in the back. Carrington testified that he immediately fled and that as he ran away, he heard more gunshots. He testified that he met Mr. Banks later that night, and Mr. Banks told him that he shot these people as a retaliation because Fred had been shot. So it was obviously a gang hit, which is what the state argued at the second stage, that this was evidence of a gang hit. Carrington also told the grand jury that he'd given an Assistant State's Attorney a statement, and in 1985, Assistant State's Attorney Gross had read that statement to the grand jury, so he read it to Mr. Banks's sentencing jury as well. Now, the state also presented the testimony of Glenn Jackson, the Chief Records Officer from the Department of Corrections, and I won't go into all the detail of what he testified to, but he described four incident reports where apparently the state couldn't locate the guards who had written them, and he read the incident reports, and he also testified that his records show that Mr. Banks had a grand total of 133 violations during his time in the Department of Corrections. Counsel, should the rules of evidence be as stringent in sentencing hearings as they are in the guilt phase, or is there some difference? And secondly, are you espousing that there should be a, that we should adopt more stringent standards for death penalty cases than other criminal cases? Could you answer those questions? Yes, I would. The second question first, this is definitely an argument limited to death penalty cases. I have no desire to extend it to any of the general sentencing hearings. There are great distinctions between capital sentencing hearings. There are more rights. It's more trial-like. You have a right to a jury. You have the right to counsel. None of those rights apply at a general sentencing hearing. Now, for the first question, no, this doesn't really affect the Illinois death penalty statute at all. That statute relaxes the rules of evidence. All this does, the right to confront witnesses isn't even a rule of evidence. It's a procedural rule about how certain evidence can be admitted. The state could still present testimonial hearsay. They would just have to, we would just have to be able to cross-examine the, or had a chance to cross-examine the person if he was unavailable. No other rules of evidence would be affected. The statute wouldn't be affected because it talks only in terms of relaxing the rules of evidence, and this isn't a rule of evidence. So I would not be arguing at all that any rules of evidence have to be changed at all. Simply put, this court would just have to hold that the defendant has the right to confront witnesses at the second stage. And as I said, Justice Scalia made it clear in Crawford that that's not an evidentiary ruling. The state's evidence in this case was very prejudicial, and it shows why we need the right to confront witnesses at the second stage. You know, the person that we couldn't cross-examine, because obviously we couldn't cross-examine Mr. Carrington at the grand jury, and the defense pointed that out, and there was no argument, and there's not cross-examination at grand juries. He's a co-defendant probably. He's accompanying another gang member to the scene of a shooting. So his testimony is presumptively unreliable. At least we would like to be able to show that he's a co-defendant and that it's presumptively unreliable. You know, his story's suspicious. Mr. Banks orders him along, but then when they get to the shooting, Mr. Banks tells him to stay outside. What did he bring him along for, so he'd have another witness against him? You know, probably Carrington's right there all along, and he's minimizing his participation. But we can't show that, because he's dead. Did he decide to get on the bus first? You know, did the police catch him first, and is he throwing Mr. Banks under the bus so he can get a better deal? We don't even know whether there were any deals. We could never ask, is Carrington's testimony tainted because he got some sort of deal for implicating Mr. Banks? We don't know. And then finally, to move away from Mr. Carrington's problems, you know, he testified that Mr. Banks is a gang general, which is a bad thing. And Mr. Banks, in some of this aggravation the state presented, they have him claiming to be a gang general when he's in the prison. But it's interesting that the Department of Corrections could never corroborate that, and they found that his claims, you know, couldn't be uncorroborated. Well, now we've got Carrington, who we can't cross-examine, you know, claiming that Mr. Banks is a gang general. And, you know, that's particularly prejudicial when, in Issue 3, we note that Mr. Banks was tried by a juror who does not like gangs. And it's not as if any jurors like gangs, but this juror, you know, in voir dire said, my husband's a sergeant in the police department. He deals with gang crimes. He talks about gang crimes all the time, and I don't like gangs. So you have this very prejudicial gang hit testimony. Mr. Banks is supposedly a general in the gang coming in, and you've got this one juror amongst the others who doesn't like gangs. And in a capital sentencing hearing when any one juror can prevent the death penalty from being imposed, I think that that's an important point. It's also very prejudicial because you contrast this retaliatory, cold-blooded, premeditated gang hit with the murder that happened in this case. I'm not going to say this wasn't a horrifying crime. They all are. All these death penalty crimes are. Mr. Banks was convicted of shooting a woman in front of her children in broad daylight in a parking lot when she's taking them to the movies. I mean, that's pretty bad. But, you know, it's just a botched carjacking by a drug-addled crackhead. You know, he didn't intend to kill her. That's obvious. He told her to get out of the car. He wouldn't have told her to get out of the car if he was going to intend to kill her. He just wants the car. She was shot in the hip. But, you know, he's standing right next to the car, the driver's window. If he wanted to kill her, he could have shot her right in the head. You know, in contrast to this incompetent, drug-addled crime that cost this woman her life, you have this premeditated gang hit, and, you know, we can't bring out anything to show that maybe the premeditated gang hit was mainly Carrington's idea or anything like that. Mr. Andrews, does this require this court an overruling of Casillas, or is this just a new rule that you want us to put in place? You know, I have to admit, Casillas, I'm not familiar with that case. It doesn't require overruling any of this court's precedent that has held that cross-examination does not apply at the second stage of the sentencing hearing, because at the time those decisions were made, they were perfectly correct. They were made, Roberts v. Ohio was decided in 1980 when this court was starting to formulate its death penalty jurisprudence, and, you know, Roberts v. Ohio required relevance and reliability, and that's what this court held was necessary at these second stages. It's only since... The reason I mention Casillas is because it was a holding that indicated that hearsay evidence is admissible, and I believe in response to Justice... At the sentencing hearing, I believe in response to Justice Garmon's question, you indicated it still can be. Oh, absolutely. Hearsay is absolutely admissible. As I said, this doesn't change any of the rules of evidence. However, if they want to present the testimonial hearsay described in Crawford, then they have to allow us to cross-examine. But testimonial hearsay is still admissible if they comply with the Confrontation Clause. As I tried to... That specific issue has never been addressed by this court, to your knowledge? The Confrontation Clause, not that I know of, and the U.S. Supreme Court has not held that it applies to the selection phase of a capital sentencing hearing. Various state courts have held that it does. California, North Carolina, Texas, you know, the largest death rows in the country, Florida, and then other states like Nevada, you know, have held that it doesn't, and circuit courts of appeals have held that it doesn't. It's an open question. But I guess I'd like to address maybe what, you know, what I would call... to Illinois jurisprudence. You know, I've already touched on the idea that you wouldn't have to overrule any prior decisions because they were correctly decided at the time. This court would just be recognizing that Crawford has, you know, they have all sorts of words for it, a sea change or whatever, but it's fundamentally offered the law of confrontation, and this court would just be modifying, changing its jurisprudence to reflect that change. You know, it doesn't in any way affect the validity of the statute. I've touched on that. The other rules of evidence, all the rules of evidence can still be relaxed. You just have to afford confrontation for this one particular type of hearsay. You know, Texas, Florida, California, they've all managed to sentence people to death while affording the defendant the right to cross-examine witnesses at the second stage of the sentencing hearing. It's really not going to hamstring the state. And as Justice Thomas, I believe, touched on it, it really is a new rule. I don't see that it's even going to affect anybody who's already any of the dozen or so people who are already on death row. It's a new rule. They were operating under the old rules of procedure. They wouldn't have any grounds for challenging their death sentences on the fact that they weren't afforded the right to confront witnesses. So, again, I don't think that this change would really affect the way things have been done, and it would merely, for a certain type of evidence, you know, allow cross-examination. The final point I'd like to make is about the states that have refused to extend the right to confront witnesses to the selection phase of the eligibility hearing. They all rely on this case, Williams v. New York, that's from 1947, 1949. It's 60 years old. You know, when that case was decided, the right to confront witnesses hadn't even been applied to the state, so it was a due process case. It's just an outmoded view of the way capital sentencing hearings are conducted. And the main point there was that there's no difference between a capital sentencing hearing and a general sentencing hearing, a sentencing hearing in any other case. And as Justice Garmon, you know, her question brought out, that's not our position here. Now there are huge differences. Right to the jury, you know, the jury's instructed. You know, there's discovery now. I mean, a capital sentencing hearing, the first and second stages are completely different from the way capital sentencing hearings were conducted in 1949 and from the way that general sentencing hearings are conducted. And it's those differences that require the right to confront witnesses to be applied at the second stage of a sentencing hearing. And that would conclude my presentation. Are there any other questions I could answer for the Court? Thank you. Counsel, you may proceed. Mr. Chief Justice, esteemed members of the Court, I am Assistant State's Attorney Tasha Marie Kelly of the Cook County State's Attorney's Office in Chicago. This Court should affirm the first-degree murder conviction and corresponding sentence of death for the defendant, Deion Banks, which were more than warranted in this case. On March 24, 2001, this defendant decided to go to the parking lot of Ford City Mall in Chicago with his co-defendant, Shakina Fazil, to steal a new car. When they arrived, the defendant selected a car belonging to a woman named Rose Newbern, a young mother who had simply come to the mall with her two young sons, Quincy, aged four, and Tyrone, aged five, to see a movie and enjoy some time together as a family. Once defendant decided that he wanted Rose's car, he was not going to let anything stop him, even the fact that the Newbern family was still inside. Instead, defendant broke the window, pulled Rose out through the broken glass, threw her on the ground, and shot her while her children watched from the back seat. Then defendant got in the car and drove away with Tyrone and Quincy still in the back and Rose lying on the ground. Defendant eventually let Tyrone and Quincy out, and during his attempt to escape with Shakina Fazil, he shot at Joseph Harrison and his pregnant fiancé, Retrinia Smith, who were involved in a car accident with his co-defendant and engaged in a high-speed chase with police. Defendant was arrested only after he crashed his car into an elevated train platform. Defendant was then identified in two separate lineups. The first identification was made by Joseph Harrison, who identified defendant as the man who shot at him and his fiancé from a green Intrepid. The second identification was made by John Southward, a witness who was at Ford City Mall at the same time as defendant and the Newbern family. Mr. Southward identified defendant as the man he saw drive away in Rose Newbern's car. Defendant was charged with first-degree murder, attempt first-degree murder, armed robbery, aggravated discharge of a firearm, aggravated vehicular hijacking, aggravated kidnapping and possession of a stolen motor vehicle. The people filed a notice of intent to seek the death penalty, and defendant was subsequently found guilty after a jury trial of first-degree murder under an aggravated discharge of a firearm. A jury subsequently found defendant eligible for the death penalty based on his commission of the murder during the course of another felony and the fact that defendant had a previous conviction for murder in 1986 based on the gang-related shooting of Alfred Evans. After defendant was found eligible for death, the people presented witnesses and testimony in aggravation, and defendant presented his mitigation. Ultimately, the jury sentenced defendant to death, and he now brings this appeal. In regards to the two issues that defendant has addressed here today, first, Issue 6 regarding the admission of testimony of privileges received by inmates both sentenced to a term of natural life imprisonment and to a sentence of death. This testimony was appropriate in that it was both relevant and reliable, which is the standard for admissibility at the second stage of the sentencing hearing, and this testimony was properly admitted for three specific reasons. First, the testimony was properly admitted because it spoke to the issue of defendant's future dangerousness, which has been found by this court previously to be a relevant issue for jurors at this stage of the proceedings. Specifically, the people presented evidence and argument in the form of this and supported it with their argument in regards to the issue of defendant's future dangerousness and how the discussion of privileges that would be received by defendant if he were to receive both a term of natural life or a sentence of death addressed the issue of his future dangerousness. And specifically, during the course of the people's closing arguments, and I will quote to this court beginning from page 2938 of the record, he is a violent person, a violent criminal. Even when he was sent to prison, he made threats and intimidated. You heard the statements he made to those guards. I got 25 years. There's nothing you can do. You better not turn your back. Threats that were continued to be made over the years that he was in IDOC. If he goes back to prison for the rest of his life, what is to stop him? Maybe he'll get sent to TAMS, but that would only be after someone gets hurt or even killed. The only way to protect the people that work in DOC, civilians, the guards, and the medical staff is to put him on death row, where he will be locked up and people will be protected from him. Because if he knows that he's going to spend the rest of his life walking around the yard, lifting weights, playing basketball, watching TV, he will do whatever he wants. He will treat his sentence as a joke. Glenn Jackson came in and testified how you make and earn rights. He hasn't done anything to earn rights for privileges. In fact, he's done anything but earn rights. He's done the opposite, continued to be violent, continued to threaten and hurt and destroy people's lives. He's going to continue to do that if he is sent to jail for the rest of his life. So this shows that the people's decision to admit testimony regarding the privileges that would be available to the defendant was admitted for the purpose of the people explaining that if defendant received these privileges, that there would be people in danger, be it other inmates or other individuals who guards, prison staff. And so it speaks to the issue of defendant's future dangerousness. It also speaks to the issue of defendant's ability to be rehabilitated in the sense that the defendant claimed that he presented evidence and testimony in mitigation, that he was in fact a peacemaker in prison, that he attempted to dissuade situations with other prisoners. He presented a guard who stated that she relied on defendant as someone to calm down situations for her with other prisoners. So it's relevant what kind of interaction the defendant would be having with other people, especially in light of the testimony that was admitted regarding his past behavior. This is a defendant who clearly would not have the ability, based on his past behavior in the Illinois Department of Corrections, to interact with people at this high level. This is an individual who has shown that he doesn't have the ability to adapt to a life in prison, especially one with this much freedom and this much privilege and this much interaction with other people. And certainly that's reflected by the testimony of the Illinois Department of Corrections officials, the Cook County jail officials, and the other individuals who testified regarding defendant's poor interactions, not only with other inmates but with Illinois Department of Corrections officials. And finally, the testimony that was admitted regarding privileges was appropriate because ultimately the issue at this stage of the proceedings is what is the appropriate sentence for this defendant based on the circumstances of his crime, his background, his character, and any other relevant things about this particular defendant. And in looking at what the appropriate sentence is for defendant, certainly the jury has a right to know all of the information about what life would be like for the defendant, both on death row and if he received a sentence of natural life. In regards to the second issue raised here by defendant today, the Crawford issue, I'd like to start by addressing the question that was asked by Justice Garmon, which was is there some difference between a trial and a sentencing hearing that calls for there not to be an application of Crawford. And certainly if you look at the idea behind Crawford and the idea behind the Confrontation Clause itself, the idea is that a defendant has the right to confront his accusers, to confront the people who are accusing him of some crime. And certainly in the context of a trial where there's a determination being made of one's guilt or innocence, this makes sense. A defendant has the right to confront a person who's accusing him of committing a murder. But when you move this into the context of the second stage of a sentencing hearing, it simply doesn't make sense. A defendant is not being accused of anything at this point in the proceedings. A determination of the defendant's guilt has already been made. And the individuals who are testifying at this stage of the proceedings are simply witnesses who are recounting events which already occurred, and they're not accusing the defendant of anything. And so the Confrontation Clause and the protections that were envisioned behind the Confrontation Clause simply don't apply at this point in the proceedings. And it's well established both by this Court and by the United States, by this Court and a long body of case law, that the standard for admissibility at this stage in the proceedings is simply that the testimony be relevant and that the testimony be reliable. And certainly the reason behind that longstanding tradition is that it's important that the individuals who are determining the proper sentence for the defendant should be afforded as much information as possible. And in a situation like this, if this Court were to apply the Confrontation Clause, then the jury here would not have been privy to significant information, and that would be the specific details of the defendant's first conviction for murder, because as counsel correctly stated, the individual who offered the grand jury testimony was deceased at the time of trial, and the people would not have been able to admit this testimony. And certainly when we're looking at giving the jury at this stage the broadest amount of information available, and the idea that they would not be allowed to have the information regarding defendant's prior crime or regarding defendant's previous behavior in the Illinois Department of Corrections simply because the people were unable to find those witnesses is unacceptable. And counsel is saying that this wouldn't change the rules of evidence, but it would. It would change the standard from being simply relevant and reliable to being something more than that. And it would put a burden on the people to find every single witness involved in every single case that the defendant has ever been convicted of, regardless of when it is. In this case, this is a conviction from basically 20 years ago with a deceased witness. And the jury would be deprived of essential evidence, and it would be making a less than informed decision. And it is correct that the cases which have held that, such as United States v. Fields, which is a United States Court of Appeals for the Fifth Circuit, and other courts which have held that the Confrontation Clause should not apply at the second stage of proceedings do rely on Williams v. New York, and that is a case from the 1940s. However, in the Fields case, the Fifth Circuit discussed why the Williams case is still relevant and why it should still be followed in situations like this. And that is because the logic that's drawn by the United States Supreme Court in Williams still holds, and that's the distinction between a trial and a sentencing hearing. And it talks about how the right to confrontation means the right to confront your accusers and how a sentencing is not pondered as part of the trial for purposes of the Confrontation Clause. And even though Williams is a due process case, and this is a Sixth Amendment challenge, the logic of Williams should still control here, and this Court should find that testimonial hearsay can be admitted at this stage of the proceedings so long as the testimony is relevant and reliable. Thank you, Counsel. Thank you. For those reasons and for those stated in the People's Brief, we would ask this Court to affirm defendant's conviction and sentence and set a date certain for his execution. Mr. Andrews. Thank you, Your Honors. The first point the State made was about it being admitted for the defendant's future dangerousness, Issue 6, the prison information. You know, even if you can comb the record and find some appropriate references in the argument, maybe to the way the evidence should have been used, the State has no explanation for the whole thrust of the argument, the end of the rebuttal that I read to you at length, where the whole point is, it isn't linked to how he's going to interact with the other inmates, it's all about how much fun he's going to have in prison. And so they might be able to show you where there's a fleeting reference to it, but that doesn't mean that the evidence was properly admitted or that it was properly used, because of the end of that closing argument. You just can't ignore that. You know, they just didn't say that he was going to misbehave because there was woodshop or because he had a movie. They said he was going to enjoy himself because he could go to woodshop or go to a movie. Now, the State cited other examples from their arguments, and that was an appropriate argument. And the reason it was appropriate is because they were referring to the witnesses who got on the stand and described what a jerk and what an obnoxious person my client was in prison. All that argument that she read to you was referring to the witnesses they presented, all the prison guards and everything. It didn't have anything to do with the privileges from, you know, that the Department of Corrections affords inmates. As for the right to confront witnesses, she says that there's a difference between trial and sentencing. The first thing I would point out is that the Sixth Amendment starts off in all criminal prosecutions. Sentencing is part of the criminal prosecution, and that's one reason why you should apply the Sixth Amendment rights to it. It's part of the prosecution. You know, not being accused of anything at sentencing, he's being accused of not being fit to remain alive. He's being accused of having committed, you know, of various things. It's just part of the prosecution. There are a lot of similarities between a capital sentencing hearing and the trial. It isn't different like it was in Williams. You know, in Williams, Justice Black said that the judge could sentence a defendant for death without ever saying why. You know, he can consider anything he wants. You know, now you have a right to jury. You have the right to counsel. Counsel makes an opening statement. They make closing statements or instructions to the jury. Formal unanimous verdicts are returned. It's completely trial-like anymore. And the right to counsel, an interesting point is, it is diminished by the fact that counsel can't cross-examine people like Carrington, this testimonial hearsay. This would make the right to counsel even more valuable. You know, she talked about how relevant and reliable is the only standard and that it should remain so. I think that extending the right to confront witnesses would simply increase the reliability of these proceedings so that the state couldn't present people like Carrington who may have all these deals. You know, she pointed out that they would lose this information from Carrington. And I don't know, that's not necessarily true, though. Perhaps they could have presented the factual basis from Mr. Banks' guilty plea. I don't know if that's out there or not, but that would be an admission by Mr. Banks, and that would be relevant and reliable and it would be admissible and that would solve that problem. You know, she can't show that there is no information out there to replace Carrington's testimony. You know, and finally, placing the burden on the people. Well, the people are seeking to kill Mr. Banks, and I think it's appropriate that whatever burdens exist should be placed upon them. And if it comes down to prosecutors having to work a little harder, maybe as hard as they do in Texas or in Florida, compared to the reliability of the sentencing hearing, then I think this Court should come down on the side of reliability. We should increase the reliability by providing the right to confront witnesses. Thank you. Thank you, counsel. Case number 103-933, People v. Deon Banks, will be taken under advisement.